**24-10029**

IN THE

# United States Court of Appeals

**FOR THE ELEVENTH CIRCUIT**

◆ ◆ ◆

RICARDO DEVENGOECHEA,

*Plaintiff-Appellee,*

—v.—

BOLIVARIAN REPUBLIC OF VENEZUELA, a foreign state,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

## BRIEF FOR PLAINTIFF-APPELLEE

MAX R. PRICE
LAW OFFICES OF MAX R. PRICE, JR.
6701 Sunset Drive, Suite 104
Miami, Florida 33143
(305) 662-2272

*Attorneys for Plaintiff-Appellee*

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Eleventh Circuit Rule 26.1 Appellee Ricardo Devengoechea certifies the following individuals and parties may have an interest in the outcome of this appeal.

1. Bank of America (Garnishee)

2. Becerra, The Honorable Jacqueline (United States Magistrate Judge)

3. Bianchi, Jaime (Counsel for Appellant)

4. Bilzin Sumberg Baena Price & Axelrod (Former Counsel for Appellant)

5. Blasi, Fernando (Member of CAPA)

6. Cordano, Miguel (Counsel for Garnishee)

7. Council for the Administration and Protection of Assets of the Republic of Venezuela (Consejo de Administracion y Proteccion de Activos de la Republica de Venezuela (CAPA)

8. Curtis Mallet-Prewvost Colt & Mose, LLP (Former Counsel for Appellant)

9. DeLelle, Claire (Counsel for Appellant)

10. Devengoechea, Ricardo (Appellee)

11. Fay, Dylan (Counsel for Appellant)

12. Ferri, Marco, Esq. (Former attorney for Appellee)

13. Freyre, Arthur, Esq. (Former attorney for Appellee)

14. Garcia, Robert (Former Counsel for Appellant)

15. Goicoechea, Yon (Member of CAPA)

16. Grossman, Dennis (Counsel for Appellee)

17. Huck, the Honorable Paul C. (United States District Court Judge)

18. Krauland, Edward, Esq. (former attorney for Appellee)

19. Lustrin, Lori (Former Counsel for Appellant)

20.    Marcano, Gustavo (Coordinator of CAPA)

21.    Meehan, Kevin (Former Counsel for Appellant)

22.    Millan, Carlos (Member of CAPA)

23.    Mora, Martha Rose (Former Counsel for Appellee)

24.    Poblete Tamargo (former attorneys for Appellee)

25.    Pizzurro, Joseph (Former Counsel for Appellant)

26.    Price, Max (Counsel for Appellee)

27.    Trahan, Blair (Counsel for Appellant)

28.    Steptoe & Johnson LLP (former attorneys for Appellee)

29.    Uzcategui, Rene (Member of CAPA)

30.    White & Case LLP (Counsel for Appellant)

31.    Widom, Mitchell (Former Counsel for Appellant)

Appellee, Ricardo Devengoechea, submits that he is an individual and thus is not a subsidiary or affiliate of a publicly-held corporation.  No publicly traded company has a financial interest in the outcome of this case or appeal.

> Respectfully submitted,
> LAW OFFICES OF MAX R. PRICE, P.A.
> Attorney for Plaintiff-Appellee,
> Ricardo Devengoechea
> 6701 Sunset Drive #104
> Miami, Florida 33143
> Tel.: (305) 662-2272
> Fax: (305) 667-3975
> Primary: mprice@pricelegal.com
> Secondary: mia@pricelegal.com
>
> Max R. Price
> BY:_____
> MAX R. PRICE
> FBN:  651494

## II. STATEMENT OF ORAL ARGUMENT

Plaintiff-Appellee believes that oral argument will be useful and is prepared to assist the court

## III. TABLE OF CONTENTS

PAGE

I.   CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT............................................... C-1

II.  STATEMENT OF ORAL ARGUMENT ............................. i

III. TABLE OF CONTENTS................................................ ii

IV.  TABLE OF AUTHORITIES........................................... v

V.   ISSUES ON REVIEW................................................. 1

VI.  INTRODUCTION AND OVERVIEW................................ 2

VII. STATEMENT OF THE CASE ....................................... 4

    A.  Factual Background................................................ 4

    B.  Numerous Errors and Insufficiencies in Venezuela's Statement of Facts and Background ................................................. 8

        1.  Venezuela Errs on Three Levels in Asserting Factual Inconsistencies in Plaintiff's Filings......................... 8

            a.  The District Court as Fact-Finder Already Rejected Venezuela's Assertion of Alleged Factual Inconsistencies in Plaintiff's Filings ....................................... 9

            b.  After Trial on the Merits, It Is the Trial Record That Counts, Not the Earlier Motion Record .................. 10

            c.  Contrary to Venezuela's Assertions, There Were No Material Inconsistencies in Plaintiff's Filings........... 11

        2.  The Irrelevance of Venezuela's Discussion of its "Political Crisis" – Venezuela is Bound by the 2007 Actions of Its Chavez Administration, Regardless of Later Diplomatic Changes....................................................... 16

PAGE

3.  Venezuela's Inaccurate and Misleading Description of The Summary Judgment Process and Filings ..................... 18

4.  Venezuela's Numerous Errors and Misstatements Concerning the Parties' Settlement and the Need For an OFAC License ................................................. 19

5.  Venezuela's Misdescription of the Trial..................... 20

VIII. STANDARD OF REVIEW ........................................... 30

IX. SUMMARY OF ARGUMENT ........................................ 31

X. ARGUMENT................................................................ 33

A.  It Would be Unfair and Prejudicial to Plaintiff to Permit Venezuela to Press on This Appeal Evidence and Trial-Type Objections It Waived by Boycotting Trial in the District Court................. 33

B.  Venezuela Errs in Asserting Venezuelan Bailment Law ........ 34

C.  Venezuela Errs in Asserting That Plaintiff Failed To Prove FSIA Jurisdiction By Failing to Prove a "Valid Claim" – This is an Argument Which Relates to the Merits, Not FSIA Jurisdiction, Alternatively, Plaintiff Proved a Valid Claim Anyway.......... 36

D.  Venezuela's Arguments About the Alleged Lack of Authority of Its Officers and Alleged Lack of a Bailment Contract Suffer From the Same Defect – They Relate to the Merits, Not Jurisdiction, and Thus Do Not Defeat FSIA Jurisdiction........ 42

E.  Venezuela Errs in Disputing the Three Bases for FSIA Jurisdiction in § 1605(a)(2) ........................................ 46

1.  Plaintiff Has Proved, and the District Court Has Found, The Third Basis for FSIA Jurisdiction in § 1605(a)(2)........... 47

2.  Plaintiff Has Proved, and the District Court Has Found, The First Basis for FSIA Jurisdiction in § 1605(a)(2)............ 51

iii

PAGE

    3.  Plaintiff Has Proved, and the District Court Has Found, The Second Basis for FSIA Jurisdiction in § 1605(a)(2) .........   54

  F.  Venezuela's Challenge to Personal Jurisdiction Is Meritless and Waived ....................................................   54

  G.  Venezuela's Challenges to the Damage Award are Meritless And Waived ....................................................   55

XI. CONCLUSION ........................................................   57

XII. CERTIFICATE OF COMPLIANCE .................................   58

iv

## IV. TABLE OF AUTHORITIES

PAGE

## Cases

*Anderson v. City of Bessemer City,*
470 U.S. 564, 574 (1985) ................................................... 30

*Aquamar S,A. v. Del Monte Fresh Produce N.A.,*
179 F.3d 1279, 1297 (11th Cir. 1999) ................................ 40

*Bolivarian Republic of Venezuela v. Helmerich & Payne Intern.
Drilling Co.,*
581 U.S. 170, 178 (2017) ................................. 36, 37, 38, 42, 43

*Compania Interamericana Export-Import S.A. v. Compania Dominicana
de Aviacion,*
88 F.3d 948, 951 (11th Cir. 1996) ...................................... 39

*Devengoechea v. Bolivarian Republic of Venezuela,*
3rd Cir. Case 24-1518 .................................................... 2

*Devengoechea v. Bolivarian Republic of Venezuela,*
889 F.3d 1213 (11th Cir. 2018) .................. 3, 16, 38, 44, 46, 47, 49

*GDG Acquisitions LLC v. Gov't of Belize,*
849 F.3d 1299, 1307 (11th Cir. 2017) ............................. 43, 44

*Gerritsen v. Escobar y Cordova,*
688 F.Supp. 556, 559 (C.D. Calif. 1988) .......................... 40, 41

*Guarantee Trust Co. of New York v. U.S.,*
304 U.S. 126, 140-141 (1938) ............................................ 17

*Jackson v. State,*
18 So.3d 1016, 1029 (2009) .............................................. 35

*Ortiz v. Jordan,*
562 U.S. 180, 184 (2011) ........................................ 11, 22, 49

*Paquin v. Campbell LPL,*
378 So.3d 686, 690 (Fla. 5 DCA 2024) ............................... 34

v

PAGE

*Quantum Measurements Corp. v. Druck, Inc.,*
  2011 WL 1832518 *2 (M.D.Fla. 2011)...............................  35

*Rhuma v. Libya,*
  2022 WL 686432 at *1n.4 (E.D.Calif. 2022) ........................  41

*Rienzi & Sons, Inc. v. Puglisi,*
  638 Fed. Appx. 87, 89-90 (2d Cir. 2016)............................  35

*Rowe v. Schreiber,*
  139 F.3d 1381, 1382n.2 (11th Cir. 1998) ...........................  30

*Rowland v. Cal. Men's Colony,*
  506 U.S. 194, 201-202 (1993)......................................  41

*Treasure Coast Tractor Service, Inc. v. JAC General Construction, Inc.,*
  8 So.3d 461, 462 (Fla. 4 DCA 2009) ................................  51

*U.S. Bank N.A. v. Village of Lakeridge LLC,*
  583 U.S. 386, 396 (2018) ..........................................  30

*Velasquez v. General Consulate of Mexico,*
  1993 WL 69493 at *3 (N.D.Calif. 1993)............................  40

*Wachovia Securities LLC v. Banco Panamericano, Inc.,*
  674 F.3d 743, 751 (7th Cir. 2012) ..................................  35

*Wilkerson v. Seymour,*
  626 Fed. Appx. 816, 818 (11th Cir. 2015) ...............11, 22, 29, 49

## Statutes and Legislative History

Foreign Sovereign Immunities Act ("FSIA"),
  28 U.S.C. §§ 1330 & 1602 *et seq* ................  1, 2, 3, 36, 37, 42, 46

28 U.S.C. §§ 1605(a)(2)......................... 2, 37, 38, 42, 46, 47, 51, 54

28 U.S.C. §§ 1605(a)(3) ...........................................  36

28 U.S.C. §§ 1608(e) ..........................................  39, 40

28 U.S.C. §§ 1610..............................................  2, 21

PAGE

**<u>Court Rules</u>**

Fed.R.Civ.P. 12(h)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fed.R.Civ.P. 15(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Fed.R.Civ.P. 44.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Fed.R.Civ.P. 62(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## V.   ISSUES ON REVIEW

1.   After the District Court held a full trial on Plaintiff's claim under the Foreign Sovereign Immunities Act ("FSIA"), is there sufficient evidence in the trial record to sustain the District Court's factual findings in favor of FSIA jurisdiction where the trial record contains extensive testimony by Plaintiff showing the parties' Agreement and its breach by Defendant, in addition to Plaintiff's numerous exhibits, the testimony and exhibit of Plaintiff's former attorney, and the detailed testimony and report of Plaintiff's damage expert?

2.   Is it improper for Defendant Venezuela to challenge for the first time on appeal the District Court's damage award to Plaintiff after trial, where Defendant Venezuela boycotted the trial and offered no objections at trial notwithstanding Defendant's earlier appearance in the action, and the damage award is supported by the detailed testimony and report of Plaintiff's damage expert?

## VI.    INTRODUCTION AND OVERVIEW

Defendant Venezuela appeals from a final judgment after trial which awarded Plaintiff Devengoechea $17,128,630.10 for breach of contract under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.* (A.Tab.295).  Three days ago the Third Circuit, in a related appeal involving these same parties, summarized the facts:

> "The facts of the dispute between Plaintiff and Defendant are, in a word, ***appalling*** ….    Defendant, the Bolivarian Republic of Venezuela, ***deceived Plaintiff*** into parting with an irreplaceable collection of documents, artifacts and memorabilia once belonging to Simón Bolívar.  This collection had passed down in Plaintiff's family for generations.  Defendant's agents visited Plaintiff at his home in Florida and convinced him to gather his collection, travel with it to Venezuela, and leave it there so that Defendant could evaluate its authenticity. Defendant promised to either purchase the collection or return it after it had been evaluated, but that promise proved to be illusory. When Plaintiff realized the collection was not going to be returned to him and that he would not be compensated, he sued Defendant in Florida and obtained a judgment for $17 million."

*Devengoechea v. Bolivarian Republic of Venezuela,* Appeal no. 24-1518 at p.2

(3d Cir. July 9, 2024; emp.added). [1]

---

[1] The appeal in the Third Circuit, although related, dealt with an issue different from the issue in the present appeal.  The Third Circuit appeal dealt with Plaintiff's attempt to ***enforce*** his judgment against Venezuelan assets and Venezuela's assertion of "execution immunity" under 28 U.S.C. § 1610.  By contrast, the present appeal deals with the underlying judgment itself and Venezuela's assertion of "jurisdictional immunity" to suit under 28 U.S.C. § 1605(a)(2) after Venezuela lost at trial.  As the Third Circuit recognized, the issues are different, and the existence of "execution immunity" which precludes ***enforcement*** against certain assets (Third Circuit decision) does not invalidate the judgment itself.  *See* Third Circuit Decision at p.8n.18.  Here Plaintiff seeks affirmance of the judgment.

In the present case, Venezuela defended against this action for 8 years through counsel-of-record, lost an interlocutory immunity appeal in this Court,[2] thereafter discharged its counsel-of-record, and strategically declined to appear at trial – even though Plaintiff served on Venezuela repeated notices of the trial schedule and copies of all filings after its counsel-of-record withdrew (*see e.g.* S.A.Tab.271).  Venezuela now seeks this Court's "sympathy" because the trial was "one sided" after it elected not to attend.

So extensive and timely were the notices Plaintiff served on Venezuela that Venezuela does not challenge on this appeal the notices it received.  Plaintiff also served notices and filings on separate counsel whom Venezuela retained to monitor the case from the sidelines.

At the time of trial, Venezuela was defendant *pro se* as permitted under the FSIA, even though strategically it declined to attend.  At trial the District Court received without objection Plaintiff's testimony showing the parties' contract, his compliance and Venezuela's breach, and his expert's testimony and report.  The District Court filed detailed Findings of Fact and Conclusions of Law ("FFCL") (A.Tab.293), and entered judgment for $17,128,630.10 (A.Tab.295).  Plaintiff promptly served Notice of the Judgment and FFCL on Venezuela directly and on its sideline counsel (S.A.Tab.297).  Venezuela retained new counsel and appeals.

---

[2] *Devengoechea v. Bolivarian Republic of Venezuela,* 889 F.3d 1213 (11th Cir. 2018).

-3-

## VII.  STATEMENT OF THE CASE

### A.     Factual Background [3]

The basis of Plaintiff's action was Venezuela's breach of the parties' agreement concerning Plaintiff's valuable collection of documents, artifacts, and memorabilia once belonging to the famous South American General Simon Bolivar.  Bolivar, known as the "Liberator," became famous by leading five South American countries in successful revolutions against Spanish colonial rule (A.Tab.293 FFCL p.2).  Bolivar also is known as the George Washington of South America (A.Tab.310 Trial.tr.16:5-8).  The items in Plaintiff's collection included:

> "thousands of historic documents including correspondence and writings of Simon Bolivar, both personal and official/governmental, many with Bolivar's signature, medals, epaulets of General Napoleon Bonaparte of France (where Simon Bolivar had resided for a time), Simon Bolivar's one-of-a-kind Liberation Medal of Peru, and a DNA sample (hair locket) (the "collection")."

(A.Tab.293 FFCL p.2; A.Tab.310 Trial.tr.23:8-25:4; pictures and copies in S.A.Tab.317-5 Trial.exh.8C).

Plaintiff obtained the collection through family inheritance.  Bolivar gifted the items to Plaintiff's great-great grandfather Joaquin deMier who was Bolivar's

---

[3] The facts are taken from the District Court's Findings of Fact and Conclusions of Law, after trial on the merits (A.Tab.293 "FFCL"), with appropriate citations to the underlying record.  Following this Factual Background, Plaintiff addresses in this Brief the numerous misstatements in Venezuela's Statement of Facts, showing in detail the numerous errors and insufficiencies in Venezuela's Statement of Facts.

close friend and business associate. The collection was handed down from generation-to-generation in Plaintiff's family. Plaintiff acquired the collection in 2005 upon the passing of his mother (A.Tab.293 FFCL p.3; A.Tab.310 Trial.tr.17:6-22) (Family Tree showing Plaintiff's relationship to deMier in the book *"La Carta"* [*"The Letter"*] at S.A.Tab.264-1, exh.1 to Plaintiff's Decl., A.Tab.264) (also in Venezuela's Appendix at A.Tab.200-1 p.62).

In 2007 Defendant Venezuela became aware of Plaintiff's collection and sent several high governmental officials in a private jet to Florida to specifically target Plaintiff in an effort to gain possession of his collection. These officials included Ms. Delcy Rodriguez who then was Coordinator General of the Office of Venezuela's Vice-President and who today is herself Vice-President of Venezuela. Venezuela's officials, after meeting with Plaintiff, and wining-and-dining him near his home in Orlando, Florida, reached the following agreement with Plaintiff in Florida – that Plaintiff would renew his passport, gather his collection, and bring it with him onboard their private jet to Venezuela where its experts would "examine" the collection, and that after this examination, Venezuela would either pay an agreed price for the collection or return it to him at his home in Orlando, Florida (A.Tab.293 FFCL p.5; A.Tab.310, Trial.tr.21:20-22:8).

Plaintiff complied. Defendant did not. After meeting with Venezuela's officials in Orlando, Plaintiff drove round-trip to Miami to renew his passport,

gathered his collection, and boarded Defendant's private jet with its officers enroute to Venezuela. Once in Venezuela, its "experts" examined the collection, and Plaintiff was instructed to take the collection to the home of Venezuelan President Chavez, which Plaintiff did (A.Tab.293 FFCL pp.5-6; Trial.tr.30:1-13). That is the last time Plaintiff saw his collection. Venezuela kept the collection and never paid a penny for it (A.Tab.293 FFCL pp.5-7; A.Tab.310 Trial.tr.32:8-13) – what the Third Circuit rightly termed "appalling" conduct by which Venezuela "deceived" Plaintiff (quoted p.2 *supra*).

Pictures of Plaintiff, items in his collection, and of Venezuela's officials at the Orlando, Florida airport and in their private jet enroute to Venezuela and in Venezuela itself, are in the trial record (S.A.Tab.317-5; Trial.exh.8C).

Plaintiff did all the above pursuant to the parties' above-mentioned agreement that Plaintiff would travel to Venezuela with its officials in their private jet and would bring his collection, so Venezuela's experts could examine, test and catalog it in Venezuela, and that after these procedures, either the parties would agree on an amount to be paid to Plaintiff for the collection or the collection would be returned to him at his home in Orlando, Florida. The agreed location of either alternative – payment or return – was Plaintiff's home in Orlando, Florida (A.Tab.293 FFCL p.5; A.Tab.310 Trial.tr.21:24-22:8).

Plaintiff never would have flown to Venezuela with his collection without

such an agreement. Plaintiff travelled to Venezuela, with its officials and his collection in their private jet, on October 17, 2007. *Id.*

While in Venezuela, its officials even had Plaintiff return to his home in Florida for a 48-hour round-trip to search for further items relating to Bolivar. Venezuela paid for Plaintiff's 48-hour return to the United States (A.Tab.293 FFCL p.6; A.Tab.310 Trial.tr.27:6-23; airline ticket at S.A.Tab.317-1 Trial.exh.5).

After approximately 3 weeks total in Venezuela, Plaintiff returned to the United States permanently. Periodically over the next 2-3 years, Plaintiff inquired about his collection, each time being assured that Venezuela's experts needed more time to examine and authenticate it because of its large size (A.Tab.293 FFCL p.6; A.Tab.310 Trial.tr.29:20-22).

In July 2010 articles appeared in various newspapers that Venezuelan President Chavez had ordered the exhumation of Bolivar's body. Although not mentioned in the articles, it became clear to Plaintiff that the reason for the exhumation was to test the body for a DNA match with the locket of Bolivar's hair in Plaintiff's collection (A.Tab.293 FFCL p.7; A.Tab.310 Trial.tr.26:24-27:2; news articles at S.A.Tab.317-2 Trial.exh.6).

After the exhumation, Plaintiff's calls to Venezuela went unanswered. It became clear then, in July 2010, that Venezuela was in breach of the agreement. Plaintiff retained counsel who wrote several letters to Venezuela seeking return of

the collection or payment for it (A.Tab.293 FFCL p.7; A.Tab.310 Trial.tr.30-31; letters at S.A.Tab.317-3 Trial.exh.7).    When defendant Venezuela failed to respond, Plaintiff commenced the present action in 2012.  *See generally* A.Tab.293 FFCL.

### B.    Numerous Errors and Insufficiencies in Venezuela's Statement of Facts and Background

#### 1.    Venezuela Errs on Three Levels in Asserting Factual Inconsistencies in Plaintiff's Filings

Venezuela asserts alleged inconsistencies in Plaintiff's presentation of his case in the District Court (Venez.br.4-12).  Venezuela errs on three levels. First, the District Court already addressed this same argument by Venezuela and found as fact-finder that there were no material inconsistencies in Plaintiff's filings – a factual finding which this Court should accept on appeal.

Second, after trial on the merits, it is the trial record that matters, not the motion record.  The trial record supersedes the motion record.  Third, these alleged inconsistencies do not exist in the first place (pp.11-16 *infra*).

After the District Court rejected its claim of alleged inconsistencies and denied its motion for dismissal/summary judgment, Venezuela declined to appear at trial.  Plaintiff served Notice of the trial schedule and denial of Venezuela's dismissal/summary judgment motion (S.A.Tab.271).

      **a.**      **The District Court as Fact-Finder Already**
                  **Rejected Venezuela's Assertion of Alleged**
                  **Factual Inconsistencies in Plaintiff's Filings**

The District Court as fact-finder already rejected these same factual arguments by Venezuela. In response to an earlier motion to dismiss, the District Court addressed Venezuela's assertions of alleged factual inconsistencies in Plaintiff's filings and rejected them completely (A.Tab.165 pp.2-7). The District Court, after a meticulous review of Plaintiff's filings, concluded that "[w]hile the [Second Amended] Complaint may have a few more details than the [Plaintiff's] Declaration, the crux of allegations in both is the same" (*id.,* at 2), and that "[t]he Declaration and the [Second Amended] Complaint have additional substantially similar allegations" (*id.,* at 3), and that "[t]he Court also rejects defendant's assertion that the [Second Amended] Complaint at issue is inconsistent with the First Amended Complaint and the Original Complaint" (*id.,* at 5), ultimately concluding, after a detailed review of Plaintiff's filings (*id.,* at 2-7), that:

> "After careful review of the [Second Amended] Complaint, Plaintiff so Declaration, the First Amended Complaint, and the Original Complaint, the Court rejects Defendant's contention that there are material, not to mention fatal, inconsistencies here. Ultimately, nothing in the [Second Amended] Complaint is incompatible with these other documents, and what's more, the Declaration and the [Second Amended] Complaint appear completely in accord with one another."

*Id.,* at 7 (A.Tab.165 p.7).  *See* the District Court's highly detailed review of Plaintiff's filings which led to its conclusion that, although Plaintiff's later filings had more details, the "crux" of Plaintiff's filings is the same and that there were no material inconsistencies among them. *Id.,* at 2-7.

After the District Court rejected Venezuela's arguments about alleged factual inconsistencies in Plaintiff's filings, *id.* (A.Tab.165 pp.2-7), the District Court also denied Venezuela's motion for summary judgment and dismissal (A.Tab.270).  Venezuela then made the tactical decision to not present its factual arguments at trial – indeed, not to show up at trial at all.  Instead, Venezuela improperly presents them to this Court in its appellate brief.  This Court is not the finder of facts.  This Court should reject these belated factual assertions by Venezuela about alleged factual inconsistencies in Plaintiff's filings, given the District Court's express factual findings quoted above that there were no such factual inconsistencies (p.9 *supra* discussing District Court's factual findings at A.Tab.165 pp.2-7).

### b.  After Trial on the Merits, It Is the Trial Record That Counts, Not the Earlier Motion Record

Apart from the District Court's factual finding – binding here – that there were no material inconsistencies in Plaintiff's filings (pp.9-10 *supra*), Plaintiff's prior filings are not controlling at this point.  After trial on the merits, it is the trial

record – not the earlier filings – which are controlling.  Both the Supreme Court and this Court have made this clear:

> "Once the case proceeds to trial, the full record developed in Court [at trial] supersedes the record existing at the time of the summary judgment motion…. [A]t trial the defense must be evaluated in light of the character and quality of the evidence received in court…. [O]nce trial has been had … the availability of [the defense] ***should be determined by the trial record,*** not the pleadings nor the summary judgment record."

*Ortiz v. Jordan,* 562 U.S. 180, 184 (2011) (emp.added); *see also Wilkerson v. Seymour*, 626 Fed.Appx. 816, 818 (11th Cir. 2015) (same, quoting *Ortiz v. Jordan* and admonishing that "the 'facts' as accepted at the summary judgment stage … may not be the 'actual' facts of the case").

In short, putting aside the ***lack*** of inconsistencies in Plaintiff's filings (pp.11-16 *infra*) and the District Court's express factual finding that there were no such inconsistencies (pp.9-10 *supra*), it is the trial record which is controlling, and which Venezuela ignores.

### c.    Contrary to Venezuela's Assertions, There Were No Material Inconsistencies in Plaintiff's Filings

Without prejudice, Plaintiff nevertheless addresses Venezuela's assertions. The inconsistencies asserted by Venezuela simply did not exist.  Venezuela misrepresents the record.  For example, Venezuela criticizes Plaintiff for allegedly asserting only "expropriation" as a basis for FSIA jurisdiction in his Initial

Complaint and then allegedly switching to "commercial activity" in his Amended Complaints (Venez.br.8). Not so. Plaintiff asserted "commercial activity" from the start. Plaintiff in his Initial Complaint expressly included both expropriation *and* "commercial activity" as bases for jurisdiction (A.Tab.1, Initial Complaint at ¶ 5 ["pursuant to the 'commercial activity' exception to Venezuela's sovereign immunity"] and A.Tab.1, Initial Complaint at ¶ 8 ["Venezuela is engaged in commercial activity in the United States"]). In his First and Second Amended Complaints, Plaintiff simply dropped the assertion of "expropriation" and asserted only "commercial activity" (A.Tabs.106&140) which had been in Plaintiff's Initial Complaint from the start (A.Tab.1 ¶¶ 5&8). Venezuela misrepresents the substance of Plaintiff's Initial Complaint to create an alleged inconsistency (Venez.br.8) – which does not exist – by omitting mention in its brief of Plaintiff's assertion of "commercial activity" as a jurisdictional basis in Plaintiff's Initial Complaint (A.Tab.1 ¶¶ 5&8) which is consistent with Plaintiff's two Amended Complaints (A.Tabs.106&140).

Next, Venezuela tries to create inconsistencies in its descriptions of Plaintiff's initial interactions with Venezuela's officials. Venezuela asserts an alleged inconsistency in that Plaintiff initially mentioned that Venezuela's officials contacted him whereas in a subsequent filing Plaintiff alleged that he had emailed various museums and universities (Venez.br.6). There is no

inconsistency here.   The fact that Plaintiff sent emails to museums and universities is not inconsistent with the fact that the initial contact between the parties themselves came in communications by Venezuelan officials to Plaintiff. Thus Plaintiff testified at trial that he initially inquired of various universities about his collection which triggered a response from defendant's representative Hoffman (A.Tab.310 Trial.tr.18:8-14).

Venezuela next faults Plaintiff for filing his First Amended Complaint "[w]ithout requesting leave" (Venez.br.7).  Venezuela conveniently neglects to mention that Plaintiff properly filed his First Amended Complaint as a ***matter of right,*** without need to request leave, pursuant to Fed.R.Civ.P. 15(a)(1)(B) (amend pleading as a matter of right). *See* First Amended Complaint at A.Tab.106 at p.1 ("amending his complaint as a matter of course pursuant to Fed.R.Civ.P. 15(a)(1)(B)").

Venezuela next complains that Plaintiff allegedly switched stories by claiming at one point a communication from Mier and then at another point a communication from Venezuelan officials (Venez.br.8-9).   There was no inconsistency.  Plaintiff made clear that he received communications from both, at different times, averring that:

> "7. Defendant initiated these communications through a mutual acquaintance (and relative of mine) Jorge Mier Hoffman who contacted me on behalf of the Venezuelan government.

-13-

"8. Pursuant to defendant's request, I provided to Hoffman select copies of my collection so Hoffman could send the copies to Venezuela (which the Venezuelan officials requested).

"9. Shortly thereafter defendant's officials contacted me to arrange to meet me in Orlando, Florida (where I live) to examine and begin negotiations concerning defendant's acquisition of the collection."

(A.Tab.135 Pl.Decl. ¶¶ 7-9; repeated in A.Tab.140 Second Amended Complaint ¶¶ 19-21). [4] This is consistent with Plaintiff's testimony at trial that he sent emails to universities inquiring about his collection and received a response from Hoffman (A.Tab.310 Trial.tr.18:8-14).

Next, Venezuela asserts an alleged inconsistency regarding the venue and number of agreements between the parties. Venezuela asserts that in his Declaration Plaintiff supposedly alleged an initial agreement with defendant made in Florida and a second agreement with defendant made in Venezuela but that in the Second Amended Complaint Plaintiff alleged only an agreement made in Florida (Venez.br.10-12). Not so. There was no "second agreement"

---

[4] Venezuela also asserts improper service of process under the Hague Convention and an improper garnishment which was vacated on consent (Venez.br.7). These arguments have nothing to do with the merits of Plaintiff's case. In addition, Venezuela neglects to mention that its service-of-process defense not only was meritless but also was waived. Venezuela, when represented by counsel-of-record, irrevocably waived this defense by failing to include it in its first motion to dismiss (A.Tab.137 at p.16, Magistrate Judge finding waiver) which Venezuela, when still represented by counsel-of-record, further waived by failing to challenge this Magistrate Judge Ruling in its objections on review to the District Judge (S.A.Tab.138). *See* Fed.R.Civ.P. 12(h)(1) (waiver of service defense by failing to include it in first motion to dismiss).

nor did Plaintiff ever allege a "second agreement." Plaintiff in his Declaration did not aver a second agreement but merely averred that he left the collection in Venezuela pursuant to the parties' "agreement and understanding" that he would be contacted about a purchase price or that the collection would be returned to him (A.Tab.135 ¶ 28). This was not a second agreement made in Venezuela but simply was a reference to the parties' underlying agreement made in Florida that either the parties would reach an agreement on a purchase price for the collection or defendant would return the collection to Plaintiff (A.Tab.135 ¶ 18). The Second Amended Complaint simply clarified this and made explicit that the "agreement and understanding" pursuant to which Plaintiff left the collection in Venezuela was the same "above-mentioned" agreement made in Florida (A.Tab.140 ¶ 45).

As discussed above, the District Court already had rejected this same factual argument by Venezuela, wherein the District Court expressly found no inconsistency factually (pp.9-10 *supra*).

The District Court after trial reached the same conclusion. It found a single coherent contract between the parties which governed the parties' relationship. Based upon the evidence, the District Court found:

> "[W]ithin the United States, Venezuela's officials reached **the agreement with Plaintiff** under which he would travel to Venezuela with them and bring his collection to Venezuela where its experts would examine and evaluate it, after which Venezuela either would pay an agreed price for the

collection or return it to Plaintiff at his home in Orlando, Florida. The ***ultimate and dispositive contract itself*** was agreed to by the parties within the United States. The parties actions within the United States were not merely preliminary or introductory discussions but were extensive and multiple serious negotiations which culminated in the ***ultimate agreement,*** reached in the United States, which gave rise to Plaintiff's claim."

(A.Tab.293 FFCL p.9; emp.added).

This Court reached the same conclusion. In rejecting Venezuela's prior interlocutory appeal, this Court also recognized the legitimacy and enforceability of this specific agreement. *Devengoechea v. Bolivarian Republic of Venezuela,* 889 F.3d 1213, 1219 (11th Cir. 2018).

> **2.    The Irrelevance of Venezuela's Discussion of its "Political Crisis" – Venezuela is Bound by the 2007 Actions of Its Chavez Administration, Regardless of Later Diplomatic Changes**

Venezuela spends 4 pages in its one-sided exposition on its "political crisis" following President Trump's recognition of the Guaido Administration as the legitimate representative of Venezuela in place of the Maduro Administration (Venez.br.13-16). It is not clear how this is relevant to the present appeal. The underlying actions by Venezuela concerning Plaintiff and his collection occurred in 2007 during the regime of Venezuelan President Chavez which at that time was the recognized government of Venezuela, fully recognized by the United States. Venezuela is bound by the 2007 actions of the

Chavez Administration, legitimately recognized at that time, regardless of who or what its representative is now.

The Supreme Court has made this clear. Legal obligations incurred by a foreign government, which the United States recognized at the time of the obligation, remain valid and binding on the foreign country under a successor government after a change in diplomatic recognition. This protects reliance and continuity in commercial and legal relations. As the Supreme Court held:

> "[I]t does not follow that [the U.S. President's change of] recognition renders of no effect transactions here with a prior recognized government in conformity to the declared policy of our government…. If those transactions, valid when entered into, were to be disregarded after the later recognition of a successor government, recognition would be but an idle ceremony, yielding none of the advantages of established diplomatic relations in enabling business transactions to proceed."

*Guarantee Trust Co. of New York v. U.S.,* 304 U.S. 126, 140-141 (1938) – still valid today. It is only fair that Venezuela pay its just debts incurred to Plaintiff, regardless of who or what regime represents Venezuela at the present time. *Id.*

Nor is Venezuela's "political crisis" relevant to any issue of notice or to defendant's ability to defend the action. Venezuela in its brief does not raise an issue concerning the notice it received or its ability to defend this action, if it had wanted to.

Clearly, Venezuela made a strategic decision to absent itself from trial, given its assessment of the District Court which had previously denied its

-17-

motion for dismissal/summary judgment (A.Tab.270) and rejected its arguments about alleged factual inconsistencies in Plaintiff's filings (A.Tab.165 pp.2-7 discussed at pp.9-10 *supra*). Venezuela improperly seeks to gain the sympathy of this Court from its "political crisis," when in reality it had every opportunity and notice to defend this action at trial but strategically declined to do so. It acknowledges the sufficiency of the notice it received by failing to dispute it.

### 3. Venezuela's Inaccurate and Misleading Description of The Summary Judgment Process and Filings

Venezuela misrepresents the summary-judgment filings. After describing its own summary-judgment filings (Venez.br.13), Venezuela misrepresents Plaintiff's filings in response, claiming falsely that "[p]laintiff filed a ***six-page*** opposition to the Republic's [date] motion for summary judgment" (Venez.br.18; emp.added). Not true. Plaintiff's opposition to Venezuela's motion included not only a Memorandum of Law but also: (1) a detailed 12-page Declaration of Facts by Plaintiff with 6 exhibits (A.Tab.264 plus DE 264-1 - 264-6), plus (2) Plaintiff's detailed 10-page Responding Rule 56.1 Statement (S.A.Tab.265). Venezuela ***excluded*** Plaintiff's Responding Rule 56.1 Statement from its Appendix even though it ***included*** its own Rule 56.1 Statement (A.Tab.223). Plaintiff now includes in his Supplemental Appendix his own Responding Rule 56.1 Statement (S.A.Tab.265) as a response to Venezuela's

one-sided inclusion of only its own Rule 56.1 Statement (A.Tab.223).

Based on Plaintiff's filings – his detailed Declaration (A.Tab.264), Responding Rule 56.1 Statement (S.A.Tab.265), and Memorandum of Law (DE 266) – the District Court on July 10, 2023 denied Venezuela's motion for dismissal and summary judgment (A.Tab.270) and scheduled trial for Dec. 4, 2023 (A.Tab.269).  Two days later on July 12, 2023, Plaintiff served on Venezuela formal Notice of these District Court Orders (S.A.Tab.271).  This gave Venezuela 5-months' notice of the Dec. 4, 2023 trial date as well as prompt notice of the denial of its dismissal motion – in addition to the consistent Notices of other filings and Orders which Plaintiff repeatedly served.

### 4.  Venezuela's Numerous Errors and Misstatements Concerning the Parties' Settlement and the Need For an OFAC License

Venezuela discusses the parties' settlement and the resulting OFAC license (Venez.br.16-17).  Venezuela refused to pay the agreed settlement, obviously to delay the action below by forcing Plaintiff to undertake the laborious process of getting an OFAC license from the Office of Foreign Assets Control ("OFAC") of the U.S. Treasury Dept.  An OFAC license was necessary to permit Plaintiff to receive the settlement sum because of the U.S. sanctions regime against numerous individuals and entities in Venezuela.

Venezuela argues that "Plaintiff attempted to negotiate with the Maduro regime to settle this litigation" (Venez.br.16). In 2018 there was settlement agreement (S.A.Tab.229-2, 12/14/2018 email from Venezuela's counsel-of-record). The Maduro Administration was the authorized representative of Venezuela, duly recognized by the United States government at that time.

Venezuela asserts that it was pointless for Plaintiff to pursue settlement after it (Venezuela) defaulted in making payment because the settlement automatically expired after 30 days (Venez.br.16-17). But its counsel kept open the possibility of settlement payment which prompted Plaintiff to pursue it.

Venezuela argues that Plaintiff wasted time seeking an OFAC license when allegedly none was required (Venez.br.17). Not so, for two reasons. First, Delcy Rodriguez who had negotiated the agreement with Plaintiff (and who is now Vice President of Venezuela) was herself a "blocked" party under the U.S. sanctions regime concerning Venezuela. Second, the uncertain sweep of Executive Order 13850, which broadened the Venezuelan sanctions regime with ambiguous language, compelled an OFAC license to avoid the risk of criminal and civil liability (A.Tab.226 pp.2-4).

### 5.     Venezuela's Misdescription of the Trial

After Plaintiff served repeated notices on Venezuela that the trial would

proceed on Dec. 4, 2023, the trial commenced as scheduled.  Venezuela elected not to attend.   Venezuela criticizes the District Court for granting at trial Plaintiff's motion to dispense with the automatic stay of a judgment under Fed.R.Civ.P. 62(a) "[b]efore hearing any evidence" (Venez.br.19).   Venezuela errs.  The District Court made clear it was considering the motion "[b]ased on [Plaintiff's] *proposed* findings of fact and conclusions of law" (A.Tab.310 Trial.tr.4:20; emp.added).   Thus the District Court made clear its oral ruling granting the motion was contingent upon its ultimate decision on Plaintiff's *"proposed"* findings and conclusions. *Id.   T*he District Court required Plaintiff to submit a proposed written Order which it would address after hearing the evidence and after "finalizing all the findings of fact and conclusions of law." *Id.,* at 7:14-15.  The District Court made clear that "It is now after 9:00 o'clock. The defendant has not appeared." *Id.,* at 6:22-23.

After trial, the District Court granted Plaintiff's motions to dispense with the 30-day stays on judgment enforcement and registration under Fed.R.Civ.P. 62(a) and 28 U.S.C. § 1963 (A.Tab.294), and to permit actual enforcement under 28 U.S.C. § 1610(c) (A.Tab.299).  This permitted Plaintiff to proceed in Delaware District Court to try to attach the Venezuelan-owned shares of stock in Citgo Oil Corp. *See* p.2 *supra.*

Plaintiff's first witness was his former attorney Marco Ferri.  Plaintiff had

retained Ferri to reach out to Venezuelan officials to try to regain his collection or payment for it (A.Tab.310 Trial.tr.10:3-5; letters at S.A.Tab.317-3 Trial.exh.7). Contrary to Venezuela's assertion, the District Court during Ferri's testimony did not "[i]ndicat[e] that it had already resolved liability" (Venez.br.20). The District Court's isolated statement to Ferri that it "think[s] you're entitled to [your] fees" (A.Tab.310 Trial.tr.13:12) was far from "already resolv[ing] liability." It merely was a statement that Ferri's fees are potentially an item of recovery. In any event, Plaintiff's counsel made clear that Plaintiff was not seeking attorneys fees, having "made a commitment in our pretrial statement that we're not seeking any attorneys fees," *id.,* at 13:20-21, thereby putting to rest any issue over attorneys fees. Both the District Court's Findings/Conclusions (A.Tab.293) and Final Judgment (A.Tab.295) carefully exclude any attorneys fees in Plaintiff's recovery.

Venezuela then quibbles over minor and irrelevant details in Plaintiff's trial testimony. Venezuela asserts alleged inconsistencies between Plaintiff's trial testimony and prior filings. Apart from the controlling nature of Plaintiff's trial record – not prior filings (p.11 *supra*); *Ortiz v. Jordan, supra,* 562 U.S. at 184 (2011); *Wilkerson v. Seymour, supra*, 626 Fed.Appx. at 818 (11th Cir. 2015) – the inconsistencies which Venezuela alleges are trivial. They relate to the exact number of hours Plaintiff met with Venezuela's officials in Orlando, Florida 16

years earlier in 2007 and the name of their hotel in Orlando 16 years earlier (Venez.br.20) and the exact position Delcy Rodriguez held in the Venezuelan government. Venezuela does not dispute her high position in the government (Venez.br.21), then Coordinator General of the Office of Vice President of Venezuela and today Vice President herself.

Venezuela admits that Plaintiff testified to the terms of the parties' agreement, that either he would be paid an agreed price for the collection or it would be returned to him in Orlando, Florida where he lives (Venez.br.21; A.Tab.310 Trial.tr.21:25-22:8). This Court has upheld the sufficiency of this contract as a basis for suit under the FSIA. *Devengoechea, supra,* 889 F.3d at 1219 (11th Cir. 2018) (description of the parties' agreement).

Contrary to Venezuela's brief, Plaintiff did not testify he was in Venezuela "for 'three weeks' or '30 days' " (Venez.br.21). Rather, Plaintiff testified "I was in Venezuela for approximately three weeks, almost a month" (A.Tab.310 Trial.tr.22:22-23).

Venezuela acknowledges that Plaintiff testified he was told to deliver his collection to the home of Venezuelan President Chavez which Plaintiff did (Venez.br.21-22; A.Tab.310 Trial.tr.30:1-13).

Plaintiff testified in detail to the contents of his collection which he delivered to Chavez's home. Pointing to pictures he had taken of select items in

the collection, Plaintiff described *inter alia* documents with Bolivar's signature, other documents relevant to Bolivar's history, the one-of-a-kind Liberation Medal awarded to Bolivar for liberating the nation of Peru, epaulets gifted to Bolivar by Napoleon Bonaparte, and an authenticated locket of Bolivar's hair (A.Tab.310 Trial.tr.23:8-26:7; copies at S.A.Tab.317-5 Trial.exh.8C).

Plaintiff also testified that the Peruvian Liberation Medal had extraordinary value because it completed a set of five Liberation Medals awarded to Bolivar by the five nations he liberated, all situated in a museum in Venezuela (A.Tab.310 Trial.tr.24:13-25:4).

Plaintiff also testified that, at the request of Venezuela's officials, he interrupted his stay in Venezuela to return to his home for 48 hours to search for more materials relevant to his collection but could not find any, and that Venezuela paid for this travel (A.Tab.310 Trial.tr.27:3-28:19; airline ticket at S.A.Tab.317-1 Trial.exh.5).

After returning to the United States permanently in Nov. 2007, Plaintiff remained in touch with Venezuelan officials for the next 3 years concerning his collection and their ongoing process of examination and authentication. However, after Venezuelan President Chavez ordered the exhumation of Bolivar's body in July 2010, apparently to match its DNA with the locket of hair in Plaintiff's collection, Venezuelan officials ceased their communications with

Plaintiff (A.Tab.310 Trial.tr.30:14-31:13; news articles of exhumation at S.A.Tab.317-2 Trial.exh.6).

Plaintiff then retained counsel who tried to gain the return of Plaintiff's collection or payment for it (letters at S.A.Tab.317-3 Trial.exh.7). Venezuela never paid for nor returned his collection (A.Tab.310 Trial.tr.31:17-32:15).

Venezuela never challenged the qualifications of Plaintiff's valuation expert John Reznikoff nor his detailed expert report (expert report at S.A.Tab.317-4 Trial.exh.8). Pursuant to the District Court's Scheduling Order (A.Tab.269), Plaintiff timely identified Reznikoff as his expert witness on August 4, 2023 and timely served upon Venezuela a copy of Reznikoff's expert report on August 16, 2023 (S.A.Tab.280). This gave Venezuela full notice of Reznikoff's expert report 4 months prior to trial. *Id.*

Reznikoff testified that he is "an expert witness in both questioned documents and valuation in the industry of collectibles, and … also a dealer who buys and sells collectibles, something I have been doing for 45 years" (A.Tab.310 Trial.tr.34:15-18). Reznikoff has been accepted as an expert witness in this field in both State and federal Courts (*id.,* at 35:17-22), and based upon his expertise and experience, was able to value Plaintiff's collection without actually having it in his possession, using standard sampling techniques which are widely accepted and which he used in other cases involving, for

-25-

example, documents involving President Reagan's Secretary of Defense and President Nixon (A.Tab.310 Trial.tr.36:4-37:17). These sampling techniques involved a "methodology" that was "very reliable and conservative." *Id.,* at 40:13-16. Reznikoff valued Plaintiff's collection "based on my experience and based on similar items that have been offered in the marketplace over the years." *Id.,* at 38:8-10. Reznikoff's use of comparable sales data involving historical figures and other Bolivarian items is widely accepted in his field. *Id.,* at 53:11-23, 53:25-54:5, & 55:1-6. Reznikoff also used comparable auction sales in specialized databases to which he subscribed. *Id.,* at 41:6-8. Reznikoff concluded that Plaintiff's collection had a value of $8.8 million (*id.,* at 61:5; S.A.Tab.317-4 p.13, Trial.exh.8 at p.13). Reznikoff repeatedly emphasized 8 times in his testimony that this was a "conservative" figure – *id.,* at 40:2 ("conservative approach"), at 40:16 ("conservative"), at 45:5 ("really conservative"), at 45:5-6 ("Very, very conservative"), at 48:25 ("conservative approach"), at 51:25 ("conservative nature"), at 59:17 ("conservative"), & at 61:23 ("[c]onservatively").

Recognizing that Reznikoff's $8.8 million valuation was "conservative," the District Court asked for a "range" of valuation, to which Reznikoff responded "8 to 10 million." *Id.,* at 62:1-2. The District Court then valued Plaintiff's collection within this "8 to 10 million" range at $9.5 million (*id.,* at

65:12-13 & 65:22-23) – a mere 8% increase over Reznikoff's "really conservative" $8.8 million figure. The District Court found the $9.5 million value to be "the fair market value, not the conservative number or the highest number. We're looking for a fair market value." *Id.,* at 65:10-12.

Venezuela misrepresents Reznikoff's expert testimony and the District Court's response in several respects. First, Venezuela asserts that his expert testimony was based only "on interviews he conducted with Plaintiff regarding the contents of the collection and photographs of the collection provided by Plaintiff" (Venez.br.22). Not true. As discussed above, Reznikoff made clear that his valuation was based on much more. Reznikoff testified that his valuation was ***also*** based on his detailed review of comparable sales of collections involving historical figures including Bolivar himself (A.Tab.310 Trial.tr.38:8-10, 53:11-23, 53:25-54:5, & 55:1-6), which included his detailed review of other auction sales in specialized databases to which he subscribed (*id.,* at 41:6-8: "In addition to a simple Google search, I subscribe to many databases of auction results, and I'm able to search and pinpoint items that are comparable"), and also involved his use of standard and accepted methodology employed in sampling large collections, such as he used previously in connection with large collections involving Presidents Reagan and Nixon. *Id.,* at 36:4-37:17.

Second, Venezuela asserts that the District Court "invited" Reznikoff to increase his valuation to $10-$15 million. According to Venezuela, the District Court allegedly suggested that Plaintiff's collection was worth more than a separate Bolivarian collection previously sold at Christie's and allegedly suggested that Reznikoff's valuation was "a conservative number" (Venez.br.22). Not so in several respects. Contrary to Venezuela's misrepresentation, it was not the District Court that labeled Reznikoff's valuation as "conservative." It was Reznikoff himself. Venezuela fails to mention that Reznikoff himself *previously* testified twice that his $8.8 million valuation was "conservative" – A.Tab.310 Trial.tr.40:2 ("conservative approach") & *id.,* at 40:16 ("conservative") – *before* the District Court ever used the term "conservative" 4-5 pages later. *Id.,* at 44:23-45:4. The District Court simply picked up Reznikoff's own suggestion ("conservative approach") that the collection may be worth more and asked for a range that would reflect a true value rather than his "conservative approach." The District Court explained that it sought "the fair market value, not the conservative number or the highest number. We're looking for a fair market value." *Id.,* at 65:10-12 (p. 27 *supra*).

Venezuela also fails to mention that Reznikoff later reduced his estimated range. Far from being pressured by the District Court for a higher figure –

which Venezuela misrepresents – Reznikoff later re-evaluated his "range" of values *downward* to $8-10 million which included within this range his original $8.8 million figure at an approximate mid-point and thus was consistent with his original $8.8 million figure. *Id.,* at 62:1-2 ("What is the range?  The Witness:  8 to 10 million").  Venezuela neglects to mention this.

Venezuela criticizes the District Court for "reversing course" at trial to add the second "commercial-activity" basis for FSIA jurisdiction in addition to the first and third bases previously used (Venez.br.23).  There was no "reversing course."  The trial record superseded the prior motion records, *Ortiz v. Jordan, supra,* 562 U.S. at 184 (2011); *Wilkerson v. Seymour, supra*, 626 Fed.Appx. at 818 (11th Cir.2015), and permitted the additional ground (A.Tab.293 FFCL p.10).

## VIII. STANDARD OF REVIEW

The District Court's findings of fact are binding in this Court as long as they are not clearly erroneous. Fed.R.Civ.P. 52(a). This requires deference to the District Court's findings on "ultimate" facts as well as "subsidiary" facts, *Pullman-Standard v. Swint,* 456 U.S. 273, 287 (1982) (the rule "does not divide findings of fact into those that deal with 'ultimate' and those that deal with subsidiary facts"), and deference to the District Court's findings of fact based on documents and filings as well as on live testimony, *Andersen v. City of Bessemer City,* 470 U.S. 564, 574 (1985) ("even when the district court's findings do not rest on credibility determinations but are based instead on physical or documentary evidence"), and deference to the District Court's mixed findings of fact and law where, as here, the factual matters unique to this case predominate over broader legal issues. *U.S. Bank N.A. v. Village at Lakeridge LLC,* 583 U.S. 387, 396 (2018).

On all issues, if there is any basis for affirming the decision of the District Court, this Court must affirm, even if the District Court did not consider the basis which supports affirmance. *Rowe v. Schreiber,* 139 F.3d 1381, 1382n.2 (11th Cir. 1998) ("We may affirm a decision on any adequate grounds including grounds other than the grounds upon which the district court actually relied").

## IX.   SUMMARY OF ARGUMENT

There are three separate bases for FSIA jurisdiction against Venezuela in the present case.  The record satisfies all three.  Plaintiff need show only one to sustain FSIA jurisdiction.  The District Court's factual findings support Plaintiff's claim and the existence of FSIA jurisdiction.

First, there is FSIA jurisdiction because Plaintiff's claim arises out of Venezuela's commercial activity in the United States.  Venezuela's officers flew to the United States in their private jet to target Plaintiff in what the Third Circuit rightly terms an "appalling" and "deceptive" effort to take from Plaintiff his family inheritance consisting of numerous documents, artifacts and memorabilia once belonging to the famous General Simon Bolivar.

Second, there is FSIA jurisdiction because Plaintiff's claim also arises from Venezuela's actions within the United States in connection with its commercial activities elsewhere.

Third, there is FSIA jurisdiction because Plaintiff's claim also arises from Venezuela's acts outside the United States in connection with its commercial activities outside the United States which have a direct effect in the United States. The direct effect in the United States is Venezuela's failure to pay for or return Plaintiff's collection to him in the United States where Venezuela was

contractually obligated to do so.

Venezuelan law on bailments does not apply for four reasons. First, the parties' contract was made here. Second, there is no showing how Venezuelan bailment law differs from Florida's. Third, the parties already litigated this case under Florida law for many years. Fourth, Venezuela never gave notice of its intent to invoke Venezuelan law on this issue as required by Fed.R.Civ.P. 44.1.

The District Court heard the evidence at trial, credited Plaintiff's testimony and exhibits, and awarded judgment to Plaintiff. The record supports the District Court's Findings and Conclusions. This Court should affirm the Judgment of the District Court.

## X.    ARGUMENT

### A.    It Would be Unfair and Prejudicial to Plaintiff to Permit Venezuela to Press on This Appeal Evidence and Trial-Type Objections It Waived by Boycotting Trial in the District Court

By not attending the trial, Venezuela waived many trial-type objections and arguments it could have presented there.  It also waived evidence it could have offered at trial.  Venezuela should not be permitted to use on this appeal the evidence, objections and arguments it could have submitted at trial but did not.  That would seriously prejudice Plaintiff.  The trial record is closed.  Plaintiff can no longer adjust his trial presentations or evidence.  If Venezuela had attended the trial and submitted its evidence and objections there, Plaintiff could have adjusted his own presentations and evidence at trial to deal with them.  Plaintiff no longer can.

Plaintiff addresses below the circumstances in which Venezuela improperly asserts on this appeal evidence or objections it never offered or asserted at trial in the District Court – and which Plaintiff never had an opportunity to address on the trial record (pp.50-51 *infra*).

At trial, Plaintiff showed *inter alia* Plaintiff's collection, the parties' contract, Plaintiff's compliance, Venezuela's breach, and resulting damages through expert Reznikoff's testimony and report (pp.4-8 & 21-29 *supra*).

-33-

Venezuela never objected nor submitted a contrary report.  Venezuela does not dispute in its brief the sufficiency and promptness of the notices it received of the trial schedule.

### B.    Venezuela Errs in Asserting Venezuelan Bailment Law

Venezuela repeatedly asserts the applicability of Venezuelan, rather than Florida, bailment law because under Florida choice-of-law rules, the applicable substantive law is where the contract is "made" (Venez.br.36).  Because Plaintiff delivered his collection to the home of Venezuelan President Chavez in Venezuela, Venezuela asserts Plaintiff's contract was "made" in Venezuela and thus supposedly requires the application of Venezuelan substantive law (Venez.br.37-38 & 51-52).

Venezuela errs on several levels.  First, the parties' agreement was not "made" in Venezuela.  It was "made" in Florida where the parties reached agreement on "the ultimate and dispositive contract itself" (A.Tab.293 FFCL p.10, quoted fully at pp.15-16 *supra*).  Although part of the initial ***performance*** was in Venezuela where Plaintiff delivered the collection to Chavez's home, the contract was ***"made"*** in Florida where the parties agreed to it.  *Paquin v. Campbell LPL,* 378 So.3d 686, 690 (Fla. 5 DCA 2024) ("Florida has 'long adhered to the rule of lex loci contractus,' which is that the law of the state where

-34-

the contract was *executed* governs the rights and liabilities of the parties to the contract"; emp.added); *Quantum Measurements Corp. v. Druck, Inc.,* 2011 WL 1832518 *2 (M.D.Fla. 2011) (for Florida choice-of-law purposes, where a contract is "made" is where it is "executed"). Since the parties agreed to their contract in Florida, they "made" their contract in Florida which requires the application of Florida law.

Second, Venezuela never informed the Court or Plaintiff as to what Venezuelan law provides. Under Florida choice-of-law rules, therefore, Venezuelan law is treated as being the same as Florida law. *Jackson v. State,* 18 So.3d 1016, 1029 (2009) ("Where … the law of a foreign forum is claimed to be dispositive but [its substance] is not pleaded to the trial court, the matter is to be determined by the law of this State, and a presumption arises that the foreign law is the same as ours").

Third, Venezuela, with counsel-of-record, litigated this case for 8 years under Florida substantive law. Florida law therefore applies. *Wachovia Securities LLC v. Banco Panamericano, Inc.,* 674 F.3d 743, 751 (7th Cir. 2012) ("[A]ppellants did not address choice of law until appearing for trial after four years of litigating this case. By waiting all that time … appellants acquiesced to [local] Illinois law."); *Rienzi & Sons, Inc. v. Puglisi,* 638 Fed.Appx. 87, 89-90 (2d Cir. 2016) (same, acquiescing to local New York law after using it for 3 years).

Fourth, Venezuela never gave notice in the District Court that it wished to invoke Venezuelan substantive law on bailments.  Venezuelan law thus does not apply. Fed.R.Civ.P. 44.1.

In short, the applicable substantive law is Florida's.

**C.    Venezuela Errs in Asserting That Plaintiff Failed To Prove FSIA Jurisdiction By Failing to Prove a "Valid Claim" – This is an Argument Which Relates to the Merits, Not FSIA Jurisdiction. Alternatively, Plaintiff Proved a Valid Claim Anyway.**

In its general argument about FSIA jurisdiction (Venez.br.28-32), Venezuela asserts that, as a jurisdictional matter under FSIA, Plaintiff must prove the ultimate merit of his claim and must prove jurisdiction by proving a "valid claim" (Venez.br.29).

Venezuela errs.  A "valid claim" relates to the merits, not jurisdiction.

In support of its "jurisdictional" argument, Venezuela cites *Bolivarian Republic of Venezuela v. Helmerich & Payne Intern. Drilling Co.,* 581 U.S. 170, 178 (2017) (*"Helmerich"*).  *Helmerich* is quite to the contrary.  *Helmerich* expressly distinguished between FSIA jurisdiction and the merits of a claim.  In *Helmerich,* FSIA jurisdiction was predicated on the expropriation exception to sovereign immunity which provided for FSIA jurisdiction concerning "property taken in violation of international law" (28 U.S.C. § 1605(a)(3)).  The Supreme Court in *Helmerich* was careful to distinguish between FSIA jurisdiction and the

merits, holding that the proof necessary to show FSIA jurisdiction was limited to the exact text of the FSIA jurisdictional statute and required proof only that "property [was] taken in violation of international law," 581 U.S. at 178, and that everything beyond that related to the merits, not jurisdiction.  According to the Supreme Court, the actual ownership of the property was a separate matter which was part of the merits, not FSIA jurisdiction. *Id.*  Thus the Supreme Court in *Helmerich* held that for FSIA jurisdiction, a Plaintiff need only track the language of the FSIA statute and show that property:

> " 'was taken in violation of international law.'  [Plaintiff] need not show, as a ***jurisdictional*** matter, that he, rather than someone else, owned the [property].  ***That question is part of the merits of the case*** and remains 'at issue.' "

*Helmerich,* 581 U.S. at 178 (2017) (first emp.orig.; second emp.added).

*Helmerich* shows that the present Plaintiff need not show the ultimate merit of his claim nor a "valid claim" to show FSIA jurisdiction, but need only prove the elements of jurisdiction in the FSIA statute.  Beyond that, the remainder of Plaintiff's claim "is part of the merits of the case." *Id.*

Here, the relevant FSIA jurisdictional statute does not require a "valid claim" or a "valid contract."  The FSIA jurisdictional statute uses no such language.  Rather, under the statute, FSIA jurisdiction depends only on a claim "based on a commercial activity," etc.  28 U.S.C. § 1605(a)(2).  Whether or not there is a "valid claim" or "valid contract" goes beyond this statutory language

and relates to the merits.  Thus for purposes of FSIA jurisdiction, Plaintiff need only show that his case is "based upon a commercial activity" which it clearly is – commercial dealings in collectibles and antiquities.[5]

In short, Venezuela's jurisdictional argument about a "valid claim" fails. FSIA jurisdiction does not depend on the ultimate existence of a valid contract nor on a "valid claim."  The existence of a "valid claim" is not part of the jurisdictional language in § 1605(a)(2) but is "part of the merits of the case." *Helmerich,* 581 U.S. at 178 (2017).   Venezuela does not challenge the merits of Plaintiff's claim in its brief.  Nor does Venezuela list the merits as an issue raised in its brief (Venez.br.4).

Without prejudice to the above, Plaintiff has proved a valid claim anyway.  Based on the testimony and exhibits at trial, the District Court found Plaintiff's contract with Venezuela which the parties reached in the United States, Plaintiff's compliance, Venezuela's breach, and resulting damages, the latter shown by the testimony and report of Plaintiff's expert John Reznikoff (A.Tab.293 FFCL pp.2-11).  The record supports the District Court's Findings and Conclusions (A.Tab.310 Trial.tr.9-63; Trial.exhs.S.A.Tabs.317-1 - 317-5).

---

[5] Venezuela, when represented by counsel-of-record, conceded that its actions relating to Plaintiff constituted "commercial activity" within the meaning of 28 U.S.C. § 1605(a)(2).  This Court accepted Venezuela's concession in the prior appeal.  *Devengoechea, supra,* 889 F.3d at 1221-1222, 1222n.10 (11th Cir. 2018) (quoting Venezuela's concession).

Next, Venezuela argues that Plaintiff failed to meet the "heightened" standard required for default judgments (Venez.br.30-31). For this proposition, Venezuela cites *Compania Interamericana Export-Import S.A. v. Compania Dominicana de Aviacion,* 88 F.3d 948, 951 (11th Cir. 1996), arguing that there is a "heightened" standard required for a default judgment, above and beyond what is required in a normal case. Venezuela errs on two levels.

First, *Compania Interamericana* imposed no such requirement. Nor is it the law. *Compania Interamericana* merely required, in a case involving a default, that Plaintiff must submit "evidence satisfactory to the Court" in support of his claim for a default judgment, *id.,* much like what is required in a normal case without a default. Here, apart from the fact that there was no default by Venezuela (pp.40-41 *infra*), Plaintiff clearly submitted "satisfactory evidence" to the District Court (A.Tab.310 Trial.tr.; Trial.exhs.at S.A.Tabs.317-1 - 317-5,). The District Court held a "full trial on the merits where Plaintiff bore all evidentiary burdens" (A.Tab.299 p.1, 12/22/2023 Order; Trial.tr. at A.Tab.310). The District Court found in favor of Plaintiff and clearly found Plaintiff's evidence to be "satisfactory" (A.Tab.293 FFCL; A.Tab.295 Final Judgment).

Second, in the present case, there was no "default" to begin with. Venezuela errs by citing 28 U.S.C. § 1608(e) (Venez.br.30-31). Section 1608(e) applies only to default judgments. As already discussed, Venezuela was not in

"default" but had appeared through counsel, then discharged its counsel, and was appearing pro se (pp.40-41 *infra*).    Plaintiff proved his case through competent evidence.

Venezuela argues that it was in "default" – and that § 1608(e) which deals with default judgments allegedly applied – because a foreign country allegedly may not appear pro se and must be represented by counsel (Venez.br.30). Venezuela errs.  The overwhelming case law permits foreign countries to appear pro se under the FSIA.  *Aquamar S.A. v. Del Monte  Fresh Produce N.A.,* 179 F.3d 1279, 1297 (11th Cir. 1999) ("It has been recognized that diplomatic agents of one state, while in another, may commence and maintain actions on behalf of their state," citing cases); *Gerritsen v. Escobar y Cordova,* 688 F.Supp. 556, 559 (C.D.Calif. 1988) ("The United States claims that allowing foreign states to represent themselves will further this purpose [of the Foreign Sovereign Immunities Act].…  Therefore, because foreign states differ in fundamental ways from other unincorporated associations, and because the policies of the FSIA are best served by allowing pro se status, this Court will allow the UMS [Mexico] to represent itself in this proceeding."); *Velasquez v. General Consulate of Mexico,* 1993 WL 69493 at *3 (N.D.Calif. 1993) ("Defendant [Mexico] may proceed pro se").

Public policy commands the same result.  It would be an unnecessary

affront to foreign nations and to their sovereign rights – and cause diplomatic problems – to require foreign nations to hire American counsel if they wished to proceed without one. Respect for the sovereign prerogatives of foreign nations and the need to avoid unnecessary diplomatic friction together command that foreign nations be permitted to choose whether to hire counsel in American Courts and that they be permitted to proceed pro se under the FSIA if they wish to.

The cases Venezuela cites are not to the contrary. Venezuela cites *Rowland v. Cal. Men's Colony,* 506 U.S. 194, 201-202 (1993) (Venez.br.30). But *Rowland* did not deal with foreign sovereigns nor with the special diplomatic issues involved. *Rowland* dealt with non-sovereign entities such as corporations, LLC's, partnerships, etc., and their representation in Court. *Rowland* does not refute the special status of "foreign states [which] differ in fundamental ways from other unincorporated associations, and … the policies of the FSIA [which] are best served by allowing pro se status." *Gerritsen, supra,* 688 F.Supp. at 559.

Venezuela cites a footnote in *Rhuma v. Libya,* 2022 WL 686432 at *1n.4 (E.D.Calif. 2022), for a bar against pro se status (Venez.br.31). *Rhuma* dealt with service-of-process issues, not pro se status, and gratuitously added the footnote as *dicta* apparently without considering the case law or policy interests.

In short, Venezuela's generalized arguments about a "valid claim" and about allegedly "heightened" standards on default are meritless and do not defeat or relate to the District Court's FSIA jurisdiction. They relate instead to the merits of Plaintiff's claim which Venezuela does not argue in its brief but which, alternatively, Plaintiff has shown anyway.

### D.    Venezuela's Arguments About the Alleged Lack of Authority of Its Officers and Alleged Lack of a Bailment Contract Suffer From the Same Defect – They Relate to the Merits, Not Jurisdiction, and Thus Do Not Defeat FSIA Jurisdiction

Venezuela's arguments about the alleged lack of authority of its officers (Venez.br.33-35) and about the alleged lack of a valid bailment contract (Venez.br.35-38) suffer from the same defect. These issues – whether its officers had "authority" to enter into the contract with Plaintiff, or whether there was a valid bailment contract – relate to the existence of a "valid contract" or "valid claim" and thus concern the merits of Plaintiff's claim. They do not concern FSIA jurisdiction. As discussed above, the Supreme Court in *Helmerich* made clear that FSIA jurisdiction is defined by the strict language of the FSIA statute and that any matters beyond its strict language are "part of the merits of the case." *Helmerich,* 581 U.S. at 178 (2017) (pp.37-38 *supra*).

Here the strict language of FSIA defines jurisdiction based on whether a claim is "based on commercial activity," 28 U.S.C. § 1605(a)(2), not on whether

there is a "valid contract" or whether the person who entered into it had "authority." There is nothing about "authority" or "valid contract" in FSIA's jurisdictional provisions. These matters therefore are "part of the merits of the case," *Helmerich,* 581 U.S. at 178 (2017) (pp.37-38 *supra*), which Venezuela has not asserted in its brief.

Alternatively, Plaintiff proved these matters at trial anyway. With regard to contractual authority and substance, Plaintiff testified without objection to the substance of the parties' agreement, his compliance, Venezuela's breach, and the apparent authority of Venezuela's personnel who identified themselves as governmental officers, along with their use of a private jet for round-trip travel between Venezuela and Florida (A.Tab.310 Trial.tr.21-32). There was no objection by Venezuela to this testimony. As mentioned above, the District Court definitively found the dispositive valid contract between the parties, Plaintiff's compliance, Venezuela's breach, and resulting damages (A.Tab.293 FFCL pp.2-7).

Venezuela's further arguments, about the apparent "authority" of its officers who travelled to Florida to meet with Plaintiff, also lack merit. Venezuela cites *GDG Acquisitions LLC v. Gov't of Belize*, 849 F.3d 1299, 1307 (11th Cir. 2017), for the alleged proposition that implied authority is limited to ambassadors (Venez.br.33). That is not what *GDG Acquisitions* held. *GDG*

*Acquisitions* simply held that a country's Budget Minister did not have the requisite level of authority from which apparent authority generally may be inferred on behalf of a country, and thus distinguished Budget Ministers from full Ambassadors. 849 F.3d at 1307 ("the province and function of an ambassador is [sic] profoundly different from the powers and responsibilities normally associated with a budget minister"). Thus even if "apparent authority" were a jurisdictional prerequisite – which it is not but rather it concerns the merits (pp.42-43 *supra*) – there is nothing in *GDG* Acquisitions to refute Plaintiff's claim.

This Court already held that apparent authority sufficed to support Plaintiff's claim under FSIA, based on the high position of Delcy Rodriguez within the Venezuelan government and Venezuela's "acts that satisfy the commercial activity" basis for FSIA jurisdiction including Venezuela's extensive commercial activities within the United States. *Devengoechea, supra,* 889 F.3d at 1227 (11th Cir. 2018). Plaintiff's unrefuted testimony showing these facts which the District Court received without objection supports the requisite apparent authority.

Venezuela argues that this Court's rule adopting apparent authority applies only at the pleading stage and not as the case progresses to trial (Venez.br.33). This argument does not make sense. It does not make sense to apply one rule of

substantive law at the pleading stage and then a more demanding rule of substance later on.  If a Plaintiff at the outset cannot satisfy a rule of substantive law that will govern at trial, then why bother the judicial system with the onus of a case that is futile?

The ultimate delivery-point of Plaintiff's collection in Venezuela further supports the authority of those who brought him there.  Plaintiff testified without objection or dispute that, once in Venezuela, he was instructed to bring his collection to the home of Venezuela's President Chavez, which Plaintiff did (A.Tab.293 FFCL pp.5-6; A.Tab.310 Trial.tr.30:1-13; pp.6 & 23 *supra*).  It is difficult to fathom a more telling indicator of authority – or ratification of authority – in a country than the involvement of its President.

Nor is Venezuela correct in asserting that a bailment contract requires identification of each item involved (Venez.br.37-38).  Venezuela raised no objection at trial when Plaintiff testified to the substance of the parties' agreement and the contents of his collection and when Plaintiff's expert John Reznikoff testified regarding the sampling techniques he used to value it.  Reznikoff testified without objection to his valuation of the collection by using reliable sampling techniques to fill in gaps relating to documents in the collection he had not seen, and testified he has done this with other document collections (A.Tab.310 Trial.tr.36:7-37:17; pp.25-27 *supra*).  Reznikoff's testimony refutes

without objection at trial Venezuela's current argument that unidentified items cannot be valued (Venez.br.37-38). Nor can Venezuela gain mileage from its references to hearsay emails from Mr. Mier who never testified at trial (Venez.br.38).

### E.    Venezuela Errs In Disputing the Three Bases for FSIA Jurisdiction In § 1605(a)(2)

Venezuela finally addresses purely jurisdictional arguments under FSIA at pp.38-48 of its brief. Venezuela attacks all 3 bases for jurisdiction under 28 U.S.C. § 1605(a)(2) relating to its "commercial activities" (Venez.br.38-48). Venezuela previously admitted that its actions relating to Plaintiff's collection were "commercial activities" within the meaning of FSIA jurisdiction under § 1605(a)(2) which this Court accepted and quoted. *Devengoechea, supra,* 889 F.3d at 1221-1222, 1222n.10 (11th Cir. 2018) (quoting Venezuela's concession).

As discussed above, Plaintiff need show only one basis for jurisdiction under § 1605(a)(2). Once a single basis for jurisdiction is present under § 1605(a)(2), the other two bases become unnecessary. *Devengoechea, supra,* 889 F.3d at 1220 & 1225-26 (11th Cir. 2018) (finding it unnecessary to consider the first and second commercial-activity bases for FSIA jurisdiction under § 1605(a)(2) after sustaining jurisdiction under the third basis in § 1605(a)(2)).

-46-

Plaintiff initially addresses the third basis for FSIA jurisdiction in § 1605(a)(2) because this Court already laid out its parameters in the prior appeal.

### 1. Plaintiff Has Proved, and the District Court Has Found, The Third Basis for FSIA Jurisdiction in § 1605(a)(2)

In the third basis for jurisdiction under § 1605(a)(2), the District Court has jurisdiction over claims concerning a foreign country's commercial activities *where:* (1) the claim arises from the foreign country's act outside the United States (2) in connection with its commercial activity outside the United States (3) that causes a direct effect within the United States. This Court in the prior appeal explained precisely how Plaintiff's claim satisfied each of these three sub-elements of the third clause – (1) that the act outside the United States upon which Plaintiff's claim is based was Venezuela's decision not to return or pay for Plaintiff's collection, (2) that the commercial activity outside the United States was Venezuela's negotiation in the private market for the collection [or other commercial activity relating to the collection], and (3) that the direct effect in the United States was the obligation of Venezuela to return or pay for the collection in the United States upon which Venezuela defaulted. *Devengoechea, supra*, 889 F.3d at 1224-26 (11th Cir. 2018) (discussing three sub-elements of third clause of 28 U.S.C. § 1605(a)(2)).

-47-

The record here shows proof of all three sub-elements in the third clause: (1) Plaintiff's claim is based on Venezuela's decision outside the United States not to pay for his collection after he delivered the collection to it; (2) Venezuela's commercial activity outside the United States was *inter alia* its marketing and authentication activities in connection with the collection; and (3) the direct effect in the United States was Venezuela's contractual obligation to Plaintiff either to pay an agreed price for the collection or return it to him at his home in the United States, along with Venezuela's failure to do either.

Venezuela challenges the "direct effect" in the United States. According to Venezuela, Plaintiff did not assert a performance obligation to pay for or return the collection in the United States until 11 years after the litigation began and supposedly admitted that Plaintiff's alleged agent in Venezuela was supposed to receive the return of the collection in Venezuela (Venez.br.43-48). Venezuela errs on 6 levels.

First, it is not true that Plaintiff waited 11 years to assert a performance obligation in the United States. This Court previously determined that Plaintiff had asserted such an obligation years earlier in 2016 in his Second Amended Complaint (A.Tab.140). In the prior appeal, this Court recognized that Plaintiff's Second Amended Complaint included exactly such an obligation. This Court held:

"Because Devengoechea alleges that payment for or return of the Bolívar Collection was to occur 'to him,' and because he sufficiently asserts that Venezuela knew that he resided in Florida, in the United States, we understand his Second Amended Complaint to allege that Venezuela was required to either make payment or return the Collection to Devengoechea *in Florida."*.

*Devengoechea, supra,* 889 F.3d at 1226 (11th Cir. 2018) (emp.added).

Second, in addition to Plaintiff's 2016 Second Amended Complaint, Plaintiff testified at his deposition in 2018 that the agreed place of Venezuela's performance was in Orlando, Florida (A.Tab.222-1 p.177:8-12: "in Orlando"). Venezuela again errs in asserting that Plaintiff allegedly delayed 11 years until 2023 in stating a U.S. venue for Venezuela's performance.

Third, Venezuela ignores the controlling effect of the trial record. Plaintiff discussed this above: After trial, the case is determined by the trial record, not earlier filings. *Ortiz v. Jordan, supra,* 562 U.S. at 184 (2011) ("[O]nce trial has been had … the availability of [the defense] *should be determined by the trial record,* not the pleadings nor the summary judgment record"; emp.added); *Wilkerson v. Seymour, supra*, 626 Fed.Appx. at 818 (11th Cir. 2015) (same) (quoted more fully at p.11 *supra*).

The trial record here shows without contradiction that, under the parties' agreement, Venezuela had an obligation to perform (pay an agreed price for the collection or return it) only in the United States (p.6 *supra*). It is the trial record that counts, not the earlier filings that Venezuela belatedly references.

-49-

Fourth, most fundamentally, Venezuela should not be permitted to use the non-trial materials – such as emails and deposition transcripts – which it now cites (Venez.br.43-48). They are not in the trial record, and Plaintiff had no opportunity to respond to them at the time of trial. If Venezuela had offered them at trial, Plaintiff could have objected and/or responded and corrected them with testimony or other evidence in the trial record. The trial record is now closed. Apart from the inaccuracies in Venezuela's presentation (Venez.br.43-48), Venezuela should not be permitted to refer to these materials.

Fifth, and by way of example, the emails which Venezuela references from Mr. Mier (a/k/a Hoffman) – and which Venezuela never offered at trial – not only are hearsay but are false. Plaintiff has refuted them previously in detail including Plaintiff's detailed showing that Mier was never his agent authorized to receive return of the collection and that Mier made numerous additional false statements in his emails (A.Tab.264 ¶¶ 33-37, Pl.Decl.).

Sixth, Venezuela misdescribes Plaintiff's deposition testimony which Venezuela never offered at trial. According to Venezuela, Plaintiff supposedly wanted to receive the collection in Venezuela because Plaintiff did not want the collection shipped to him in Orlando (Venez.br.47). That is not what Plaintiff testified to. Plaintiff testified that he did not want the collection "shipped" to him because of the risks in shipping. Thus Plaintiff testified: "Q: You would

never allow it to be shipped? A: No, not like Fedex. Are you kidding me?" (A.Tab.222-1 p.177:24-25, Pl.Dep.).  Plaintiff explained this in his Declaration where he made clear that, because of the risks in shipping, he expected the collection to be delivered to him by defendant itself and not be "shipped" through some carrier (A.Tab.264 ¶ 43, Pl.Decl.).

Venezuela's final shot under the third clause in § 1605(a)(2) concerns payment venue.  Venezuela argues that it allegedly did not have an obligation to make payment in Florida because there never was an agreed price (Venez.br.48).  This is meritless.  The parties' contract expressly provided – and the District Court expressly found – that an agreed price would be paid in Florida (A.Tab.293 FFCL p.10, quoted at pp.15-16 *supra*).    The parties' agreement controls. *Id.*    But even without such an agreement, Florida law mandates payment where the creditor (Plaintiff) is located.  *Treasure Coast Tractor Service, Inc. v. JAC General Construction, Inc.,* 8 So.3d 461, 462 (Fla. 4 DCA 2009) ("Generally, where a contract involves the payment of money and no place of payment is specified in the contract, the payment is due where the creditor resides").  There is no reason to depart from this long-standing rule.

## 2.    Plaintiff Has Proved, and the District Court Has Found, The First Basis for FSIA Jurisdiction in § 1605(a)(2)

In the first basis for jurisdiction under § 1605(a)(2), the District Court has

jurisdiction over claims based on a foreign country's commercial activity in the United States. Plaintiff proved, and the District Court found, jurisdiction under this basis (A.Tab.293 FFCL pp.9-10). Venezuela disputes it (Venez.br.38-42).

The District Court pointed to Defendant's travel to the United States specifically to meet with Plaintiff and examine his collection. The District Court also emphasized that in the United States the parties engaged in extensive negotiations which were not merely preliminary but were dispositive. The parties reached their ultimate and definitive agreement in the United States. What the District Court held, quoted above, bears repeating:

> "Venezuela's officials travelled to the United States where they repeatedly engaged in extensive negotiations and discussions with Plaintiff concerning his collection and Venezuela's possible purchase of it. Ultimately, still within the United States, Venezuela's officials reached the agreement with Plaintiff under which he would travel to Venezuela with them and bring his collection to Venezuela where its experts would examine and evaluate it, after which Venezuela either would pay an agreed price for the collection or return it to Plaintiff at his home in Orlando, Florida. The ultimate and dispositive contract itself was agreed to by the parties within the United States. The parties actions within the United States were not merely preliminary or introductory discussions but were extensive and multiple serious negotiations which culminated in the ultimate agreement, reached in the United States, which gave rise to Plaintiff's claim."

(A.Tab.293 FFCL p.9).

Venezuela argues that its commercial activity did not have "substantial contact" with the United States and was not the gravamen of Plaintiff's claim. Venezuela cites numerous cases which reject jurisdiction under this clause

where the parties only had preliminary or transitory negotiations in the United States (Venez.br.40-41). That is not the situation here. Here, unlike the cases cited by Venezuela, the parties, when in the United States, not only negotiated but reached their ultimate dispositive agreement which defined their rights and on which Plaintiff sues (p.52 *supra*).

In short, none of the cases cited by Venezuela involved the present situation – negotiations which resulted in a final agreement defining the full terms of the parties' relationship including their rights and obligations.

Nor is Venezuela correct in asserting that the parties in the United States merely had "four [to] five hours of negotiations … which resulted in an agreement to travel to Venezuela to … continue negotiations" (Venez.br.41). This is a mischaracterization ("travel to Venezuela to … continue negotiations") to give the misimpression that the parties' U.S. negotiations were merely preliminary and would "continue" in Venezuela. To the contrary, the parties' U.S. negotiations were dispositive and final and resulted in the parties' definitive agreement, reached in the United States.

Venezuela has not pointed to any case – and we are aware of none – where representatives of a foreign country traveled to the United States where they engaged in extensive negotiations with a U.S. principle under which the parties negotiated ***and finalized*** their agreement in the United States, fully defining their

rights and obligations, but yet were told that their actions were merely "preliminary" and were not a basis for FSIA jurisdiction under § 1605(a)(2).

### 3. Plaintiff Has Proved, and the District Court Has Found, The Second Basis for FSIA Jurisdiction in § 1605(a)(2)

In the second basis for jurisdiction under § 1605(a)(2), the District Court has jurisdiction over claims based on a foreign country's acts within the United States in connection with its commercial activity elsewhere. Plaintiff proved, and the District Court found, jurisdiction under this basis (A.Tab.293 FFCL p.10).

The District Court explained its conclusion:

> "The numerous acts by Venezuela within the United States, during its officials' travel to meet with Plaintiff (discussed above) clearly form a basis for Plaintiff's claim and are in connection with Venezuela's commercial activity in Venezuela. Venezuela's examination, evaluation and storage of Plaintiffs collection in Venezuela are commercial activities in Venezuela which relate to the acts within the United States upon which Plaintiff's claim is based."

(A.Tab.293 FFCL p.10). The District Court's straightforward, common-sense conclusion should be affirmed.

### F. Venezuela's Challenge to Personal Jurisdiction Is Meritless and Waived

Venezuela objects to in personam jurisdiction (Venez.br.49). Its

-54-

objection fails for two reasons.  First, its extensive contacts with and within the United States in connection with Plaintiff and his collection easily entail the minimum contacts that traditionally suffice for personal jurisdiction,

Second, Venezuela waived personal jurisdiction anyway.  Venezuela, when represented by counsel-of-record, waived this defense by suffering a loss on its motion to dismiss on this ground (A.Tab.137 at pp.15-16, Magistrate Judge Ruling) and then failing to challenge the Magistrate Judge Ruling in its objections on review to the District Judge (S.A.Tab.138).

### G.    Venezuela's Challenges to the Damage Award are Meritless And Waived

Venezuela challenges the damage award (Venez.br.49-54).  Venezuela argues the award is too high, was based on alleged judicial prompting, and failed to reflect a choice-of-law inquiry the District Court should have made. Venezuela errs in all respects.

At the outset, Venezuela should be deemed to have waived these matters. Venezuela chose not to attend the trial where it could have challenged all matters related to the damage award.  This is a classic case of waiver.

As discussed above, Venezuela's assertion of Venezuelan substantive law is meritless for numerous reasons (pp.34-36 *supra*).  It is not a basis for altering the damage award.

Second, Venezuela's allegation of judicial pressure does not wash. Plaintiff discussed this in detail above (pp.29-30 *supra*). After Reznikoff opined that Plaintiff's collection was worth $8.8 million, the District Court sought a "range" of figures and inquired whether Plaintiff's collection may be worth more than anther Bolivarian collection previously sold at Christie's. Noting that Reznikoff's valuation was "conservative" – because Reznikoff himself had previously labeled his valuation "conservative" – the District Court sought a "range" of figures, to which Reznikoff initially responded $10-$15 million and later reduced his range to $8-$10 million which placed his original $8.8 million valuation at its approximate mid-point. The District Court made clear that it sought a range because it wanted to determine "the fair market value, not the conservative number or the highest number. We're looking for a fair market value." (A.Tab.310 Trial.tr.65:10-12) (pp.27-28 *supra*).

Ultimately the District Court settled on a $9.5 million figure which was a mere 8% higher than Reznikoff's original $8.8 million "conservative" valuation (pp.28-30 *supra*). There was no judicial impropriety.

Venezuela suggests the valuation may be high because the prejudgment interest almost doubled the principle (Venez.br.50). The prejudgment interest period was 13+ years (2010-2023) which accounts for the interest sum. The interest is required by Florida law which the District Court carefully explained

in its FFCL (A.Tab.293 FFCL p.12).  The interest sum properly compensates Plaintiff for the time-loss of his collection and the money he should have received for it since 2010.

Venezuela asserts that the damage award is allegedly improper because it takes assets which should be used "for the benefit of the Venezuelan people" (Venez.br.50).  But these assets also should be used to compensate people, such as Plaintiff, who are damaged by improper governmental actions.  That is always the case in any damage award against any country.

## XI.    CONCLUSION

This Court should affirm the judgment of the District Court.


Dated:  July 12, 2024                          Respectfully submitted,


                                               LAW OFFICE OF MAX R. PRICE, P.A.

                                               by: /s/ Max R. Price
                                               Max R. Price
                                               6701 Sunset Drive (Suite 104)
                                               Miami, Florida 33143
                                               (305) 662-2272
                                               mprice@pricelegal.com
                                               mia@pricelegal.com

                                               *Attorneys for Plaintiff-Appellee*
                                               *Ricardo Devengoechea*

## XII. CERTIFICATE OF COMPLIANCE

This Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,213 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(a)(7)(B)(i) and 32(f) and 11th Cir. R. 32-4.

This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because counsel prepared it using plain, Roman Style, with exceptions for case names and emphasis, and using Times New Roman 14-point type, which is proportionately spaced font, including serifs.

Dated:  July 12, 2024               Respectfully submitted,


                                    LAW OFFICE OF MAX R. PRICE, P.A.

                                    by: /s/ Max R. Price
                                    Max R. Price
                                    6701 Sunset Drive (Suite 104)
                                    Miami, Florida 33143
                                    (305) 662-2272
                                    mprice@pricelegal.com
                                    mia@pricelegal.com

                                    *Attorneys for Plaintiff-Appellee*
                                    *Ricardo Devengoechea*

## XIII. CERTIFICATE OF SERVICE

In accordance with F. R. App. P. 25(a)(2)(B), I hereby certify that I have this day served the foregoing document via Electronic Mail generated by the Court's electronic filing system (CM/ECF) with Notice of Docket Activity addressed to all parties.

Dated:  July 12, 2024                     Respectfully submitted,


                                          LAW OFFICE OF MAX R. PRICE, P.A.

                                          by: /s/ Max R. Price
                                          Max R. Price
                                          6701 Sunset Drive (Suite 104)
                                          Miami, Florida 33143
                                          (305) 662-2272
                                          mprice@pricelegal.com
                                          mia@pricelegal.com

                                          *Attorneys for Plaintiff-Appellee*
                                          *Ricardo Devengoechea*